**Perry Lee HERRING, Petitioner–Appellant,**

v.

**Larry R. MEACHUM, Commissioner of Corrections, Respondent–Appellee.**

**No. 1871, Docket 93–2067.**

United States Court of Appeals, Second Circuit.

Argued Aug. 11, 1993.

Decided Dec. 9, 1993.

Jeremiah Donovan, Old Saybrook, CT, for petitioner-appellant.

Timothy J. Sugrue, Asst. State's Atty., Wallingford, CT for respondent-appellee.

Before WINTER, MINER, and WALKER, Circuit Judges.

WALKER, Circuit Judge:

Petitioner Perry Lee Herring appeals from a judgment of the United States District Court for the District of Connecticut, Peter C. Dorsey, *Judge,* denying his petition for a writ of habeas corpus. On appeal, Herring argues, *inter alia,* that he was deprived of due process by Connecticut's joinder of two unrelated murder charges for trial and the state trial court's refusal to instruct the jury regarding the lesser included offense of manslaughter, and that locking the courtroom doors during the jury charge deprived him of a fair and public trial.

We affirm the judgment of the district court.

## BACKGROUND

In March 1987, Perry Lee Herring went to trial in Connecticut Superior Court for two unrelated murders: the murder of Donald Gore on April 16, 1981, and that of Henry J. "Rico" Littman whose body was found on May 15, 1981. Herring was convicted of felony murder of Gore, and of being an accessory to the murder of Littman.

The state's principal witness was Herring's former girlfriend, Loretta Swain, a prostitute and shoplifter with a history of psychological problems. According to her testimony, on the night of Donald Gore's murder, Swain

was with Herring in a Hartford, Connecticut bar. She noticed Gore, whom she knew "professionally," and told Herring that she thought she could obtain money from Gore. Herring told Swain to arrange to meet Gore in a nearby parking lot, where Herring would "stick the guy up" while Gore was undressed. Swain met Gore in his van as planned. Soon thereafter, Herring approached the van and announced, "Yo, this is a stick-up." When Gore started the van and attempted to drive away, petitioner fired several shots at Gore, fatally wounding him. Swain jumped from the van and, with petitioner, fled the scene. Along the way, she dropped several personal belongings in the van and around the crime scene which were found by police, and identified as belonging to Swain. Swain was questioned as a suspect in Gore's murder, but she was never formally charged.

Another witness, Graylon Shannon, corroborated Swain's testimony regarding the Gore shooting. Shannon testified that when they were both inmates at the Hartford Correctional Center, Herring admitted to the Gore shooting. For the defense, Edward Condon, an eyewitness, testified that he heard tires screeching and shots fired, and saw a van speeding through the parking lot with a white man with long stringy hair hanging from the van. Herring is a black man whose hair is not "stringy."

In her testimony, Swain also implicated Herring in the unrelated murder of Henry "Rico" Littman. Swain told police that Herring, along with Littman and Henry Robinson, had robbed a bank, and that during the robbery Littman's face came unmasked. Herring and Robinson feared that Littman would be discovered and would, in turn, reveal their identities. They decided that "they had to get rid of" Littman to prevent police from discovering their involvement in the robbery. On May 15, 1981, Littman's body was found in the trunk of a car with his head wrapped in a black plastic bag and his hands tied. Police determined that he had died from a shotgun wound to the head.

Glenda Hightower, Robinson's former girlfriend, corroborated Swain's testimony about the Littman murder. Hightower overheard Herring tell Robinson that Littman had "to go" because bank cameras probably captured his face on film. In addition, one T.J. Thomas testified that on May 15, 1981, he had seen Robinson and another man pass him in the car in which Littman's body was later found. He saw the two men get out of the car and run away. Graylon Shannon also testified that Herring later admitted in prison that he had carried Littman's body to the car and drove to the place where the car was abandoned.

Connecticut brought two separate informations against Herring charging him with the Gore and Littman killings. The first charged murder and felony murder in connection with Gore's death; the second charged murder in connection with Littman's death. On March 9, 1987, without objection from petitioner, the informations were consolidated for trial. Shortly thereafter, the State filed an amended information as to the Littman killing, charging Herring with an additional count of conspiracy to commit murder.

After the Littman information was amended to include the conspiracy count, Herring objected to the joint trial of the two informations by moving for a severance. In support of his severance motion, Herring claimed that until the Littman information was amended, to his knowledge Loretta Swain was the only witness common to both counts. He argued that the addition of the conspiracy charge to the Littman information would cause him substantial prejudice because the additional witnesses that would testify to prove the Littman conspiracy would bolster Swain's credibility as to the separate Gore murder as well. The trial court denied Herring's severance motion and the trial went forward on the consolidated charges.

During the trial, the judge instructed the jury on three occasions—in jury selection, during the trial itself, and in the final jury instructions—that the crimes charged were independent, and that the evidence regarding one murder was not to be considered in determining whether Herring was guilty as to the other. The jury returned a verdict finding Herring guilty of felony murder in connection with the death of Gore, and of being an accessory to Littman's murder, but

acquitting him of murder as to Gore and conspiracy as to Littman. The Supreme Court of Connecticut upheld the convictions, *State v. Herring*, 210 Conn. 78, 554 A.2d 686 (1989), and the United States Supreme Court denied certiorari, *Herring v. Connecticut*, 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 579 (1989).

On petition for habeas corpus, Magistrate Judge Joan Glazer Margolis issued a recommended ruling respecting Herring's arguments. The district court adopted the Magistrate Judge's ruling over petitioner's objection. We now affirm the judgment of the district court.

## DISCUSSION

### I. *Joinder of Offenses*

Petitioner first claims that the trial judge should have granted his motion for severance because joining the Gore and Littman murders for trial violated his due process rights under the Fourteenth Amendment. By adding the Littman conspiracy charge, Herring argues, the state impermissibly increased the probability of conviction on the Gore charges because, although the additional witnesses testified only as to the Littman murder, they bolstered Loretta Swain's testimony as to both. He also claims that there was an unconstitutional risk that the jury would use the evidence cumulatively to convict with respect to both murders.

■ Joinder of offenses rises to the level of a constitutional violation only if it "actually render[s] petitioner's state trial fundamentally unfair and hence, violative of due process." *Tribbitt v. Wainwright*, 540 F.2d 840, 841 (5th Cir.1976), *cert. denied*, 430 U.S. 910, 97 S.Ct. 1184, 51 L.Ed.2d 587 (1977); *see United States v. Lane*, 474 U.S. 438, 446 n. 8, 106 S.Ct. 725, 730 n. 8, 88 L.Ed.2d 814 (1986). In considering whether a violation of due process has occurred, the emphasis must be on the word "actually"; for, viewed clearly, it is only the consequences of joinder, over which the trial judge has much control, and not the joinder itself, which may render the trial "fundamentally unfair." *See United States ex rel. Evans v. Follette*, 364 F.2d 305, 306 (2d Cir.1966) (per curiam) (decision to consolidate charges for trial does not itself raise an issue of constitutional dimension), *cert. denied*, 385 U.S. 1016, 87 S.Ct. 733, 17 L.Ed.2d 552 (1967). We have recognized that "[t]here is indeed always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all." *United States v. Lotsch*, 102 F.2d 35, 36 (2d Cir.) (L. Hand, J.), *cert. denied*, 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939). We have also noted that " 'juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one.' " *United States v. Werner*, 620 F.2d 922, 929 (2d Cir.1980) (quoting *United States v. Smith*, 112 F.2d 83, 85 (2d Cir.1940)); *see also Corbett v. Bordenkircher*, 615 F.2d 722, 724–25 (6th Cir.) (describing forms of prejudice that may result from joint trial), *cert. denied*, 449 U.S. 853, 101 S.Ct. 146, 66 L.Ed.2d 66 (1980).

Nonetheless, the Supreme Court, a generation ago, explicitly accepted that "[t]his type of prejudicial effect is acknowledged to inhere in criminal practice, but it is justified on the grounds that (1) the jury is expected to follow instructions in limiting this evidence to its proper function, and (2) the convenience of trying different crimes against the same person ... in the same trial is a valid governmental interest." *Spencer v. Texas*, 385 U.S. 554, 562, 87 S.Ct. 648, 653, 17 L.Ed.2d 606 (1967). Thus, joinder of offenses has long been recognized as a constitutionally acceptable accommodation of the defendant's right to a fair trial. As discussed in the context of joinder of defendants, consolidated prosecutions "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *Bruton v. United States*, 391 U.S. 123, 134, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968); *see Zafiro v. United States*, —— U.S. ——, ——, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993). Therefore, where a defendant is claiming a due process violation based upon joinder of offenses, he must, to succeed, go beyond the potential for

prejudice and prove that *actual* prejudice resulted from the events as they unfolded during the joint trial. *Tribbitt*, 540 F.2d at 841 (joinder must "actually" render trial fundamentally unfair before habeas relief is appropriate); *see Opper v. United States*, 348 U.S. 84, 94–95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954) (general allegations of jury confusion in multiple defendant trial insufficient to warrant reversal of conviction in the absence of evidence of actual prejudice).

■ In the instant case, petitioner has not made the required showing of actual prejudice. The jury at petitioner's trial was instructed on three separate occasions that evidence of one murder was not to be used to determine petitioner's guilt with respect to the other. We must presume the jury followed these instructions "unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n. 8, 107 S.Ct. 3102, 3109 n. 8, 97 L.Ed.2d 618 (1987) (quoting *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 1708, 95 L.Ed.2d 176 (1987), and *Bruton*, 391 U.S. at 136, 88 S.Ct. at 1628); *see United States v. Colombo*, 909 F.2d 711, 715 (2d Cir.1990). No such overwhelming probability of jury confusion exists in this case; to the contrary, the probability, if anything, goes the other way. As noted by the Magistrate Judge, "[d]uring its deliberations, the jury requested the rereading of portions of the jury charges and twice requested the rereading of certain testimony." Based on the instructions, the jury seems to have carefully evaluated the evidence on each count separately; it convicted petitioner on two of the counts, but acquitted him on the other two.

Moreover, because the evidence with respect to each murder was distinct and easily compartmentalized, the risk of jury confusion at petitioner's trial was significantly limited. *See United States v. Chang An–Lo*, 851 F.2d 547, 556 (2d Cir.) (defendants were not substantially prejudiced by joint trial where "the evidence with respect to each of the defendants was adequately straightforward that the jury could consider it without any signifi-

cant spillover effect"), *cert. denied*, 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988); *Lotsch*, 102 F.2d at 36 (defendant's objection to joinder of offenses disappears when his "conduct on several separate occasions can properly be examined in detail"). The state alleged that Gore was shot with a low-caliber gun while trying to escape from a robbery, while Littman was killed with a shotgun and left in the trunk of a car. The evidence adduced to prove each crime related to a different time, place, and *modus operandi.* Moreover, the trial was not unduly lengthy or complex. Under these circumstances we easily conclude that the jury was able to deliver a reliable verdict.

Nor is there any showing that the jury improperly credited Loretta Swain's testimony on all counts because of additional corroboration from witnesses as to the added Littman conspiracy charge. Whether or not an allegation of spillover corroboration reaches a constitutional level—an issue we leave open—the jury's acquittal on the Littman conspiracy itself goes far toward answering any claim that corroboration on that count improperly motivated the jury's verdict as to the other charges.

■ Finally, it is appropriate that habeas petitioners challenging their state convictions under the general "fairness" mandate of the due process clause bear an onerous burden. Because of the significant procedural protection provided by direct review through the state system, we will not lightly conclude that state court proceedings were so arbitrary as to violate due process. *See Brecht v. Abrahamson*, —— U.S. ——, ——, 113 S.Ct. 1710, 1719, 123 L.Ed.2d 353 (1993) (presumption of finality and legality attaches to state criminal proceedings); *TXO Prod. Corp. v. Alliance Resources Corp.*, —— U.S. ——, ——, 113 S.Ct. 2711, 2720, 125 L.Ed.2d 366 (1993) (plurality opinion) ("Assuming that fair procedures were followed, a judgment that is a product of that process is entitled to a strong presumption of validity."). In the absence of some affirmative irregularity in the administration of the criminal law by the state, only in limited circumstances is habeas relief available under the general "fairness" mandate of the Fourteenth Amendment, and

even then, only upon clearly defined and narrowly limited grounds. *See Dowling v. United States*, 493 U.S. 342, 352–53, 110 S.Ct. 668, 674–75, 107 L.Ed.2d 708 (1990); *Spencer*, 385 U.S. at 565, 87 S.Ct. at 654; *Ashe v. United States ex rel. Valotta*, 270 U.S. 424, 426, 46 S.Ct. 333, 334, 70 L.Ed. 662 (1926) (Holmes, J.).

■ Petitioner raises questions of potential prejudice that are not disputed, but the potential for prejudice arising from joinder of offenses is insufficient to warrant reversing a presumptively valid state court conviction. Petitioner has not shown actual prejudice from which we could conclude that he was deprived of a fundamentally fair trial. Accordingly, we conclude that his claim that he was denied due process by the joinder for trial of the charges related to both murders is without merit.

## II. *Locking the Courtroom Doors During Jury Instruction*

■ We next turn to petitioner's challenge of the state trial judge's decision to lock the courtroom doors while instructing the jury. Petitioner claims that he was deprived of a fair and public trial as guaranteed by the Sixth Amendment and applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See In re Oliver*, 333 U.S. 257, 271–72, 68 S.Ct. 499, 506–07, 92 L.Ed. 682 (1948). In denying petitioner's request that the doors remain unlocked, the trial judge noted that

our custom [in Connecticut] has been not to disturb the contact of the judge to the jury, and the jury listening to the judge giving instructions. The hearing is still public. If people want to come in prior to the start of instructions, they are permitted. But ... to have suddenly a group come in, that distracts the jurors from what the judge is instruction [sic], and results in the jury not getting everything and having to then ask again to be instructed.

We need not delay long on whether locking the doors violated the Constitution because the trial judge's order in this case did not effect a "closure" for Sixth Amendment purposes. In *United States v. Romano*, 684 F.2d 1057, 1065 (2d Cir.), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982), we rejected as "frivolous" a claim that the defendants were deprived of a public trial because the courtroom doors were locked during the judge's charge to the jury. We thought the restriction to be reasonable in order to ensure that the jury was instructed without distraction, and held that no closure had occurred because members of the public had access to the courtroom before the doors were locked, and were present when the charge was delivered. *Id.* We therefore found that the Sixth Amendment right to a public trial was not implicated.

Petitioner claims that our reasoning in *Romano* has been undermined by the later Supreme Court decisions in *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), and *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). *Press–Enterprise* held that the press and public had a presumptive First Amendment right of access to trials which could be "overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." 464 U.S. at 510, 104 S.Ct. at 824. The Court further held that "[t]he interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id. Waller* extended the procedures announced in *Press–Enterprise* to cover the accused's right to a public trial under the Sixth Amendment as well. *See Waller*, 467 U.S. at 47, 104 S.Ct. at 2215–16; *Jones v. Robinson*, 809 F.2d 946, 952–53 (2d Cir.1987) (Kearse, J., concurring) (discussing the evolution of the legal standards).

While it is clear that *Waller* reflects an expansion of the defendant's Sixth Amendment right to a public trial, it is equally clear that *Waller* is distinguishable from the case at bar. In both *Press–Enterprise* and *Waller* the trial court had ordered complete exclusion of the public from the proceedings. *See Waller*, 467 U.S. at 42, 104 S.Ct. at 2213 (suppression hearing closed to "all persons other than witnesses, court personnel, the parties, and the lawyers"); *Press–Enter-*

*prise,* 464 U.S. at 510, 104 S.Ct. at 824 (public excluded from all but three days of six week *voir dire* and transcripts not released afterwards). Here, by contrast, spectators had unrestricted courtroom access throughout the trial, including the jury charge, as long as they arrived before it began. For those who arrived late, transcripts of the jury charge were available. Petitioner's trial was therefore "public" within the meaning of the Sixth Amendment.

For similar reasons, our decision in *Woods v. Kuhlmann,* 977 F.2d 74 (2d Cir.1992), is inapposite. In *Woods,* we upheld the trial court's exclusion of the defendant's family from the courtroom during a key prosecution witness's testimony because the witness was too intimidated to testify while they were in attendance. All other members of the press and public were allowed to remain. We distinguished *Waller* on the ground that excluding the defendant's family effected only a partial closure, and a partial closure did not "implicate the same secrecy and fairness concerns that a total closure does." *Id.* at 76. We held that to justify a partial closure the trial court need only articulate a "substantial reason," as opposed to the "overriding interest" required by *Waller* for complete closures. *Id.*

*Woods* does not apply because here the trial judge's actions did not amount even to a partial closure. All members of the public or press who wanted to observe the jury charge were permitted to do so if there was enough space in the courtroom and they arrived in time. Petitioner argues that some members of the press or public might not be able to attend locked jury charges because most people operate under time constraints and therefore cannot commit to remaining in the courtroom throughout the reading of the charge. However, the Sixth Amendment protects the right to a public trial; it does not guarantee that trials will be conducted to fit the schedules of all who wish to attend.

■ Reasonable time, place, and manner limitations on access to the courtroom are permitted to ensure the fair and efficient administration of justice. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 581 n. 18, 100 S.Ct. 2814, 2830 n. 18, 65

L.Ed.2d 973 (1980) (plurality opinion). The trial judge's order was reasonable in light of his articulated purpose for locking the courtroom doors—to avoid jury distraction while the charge was being delivered. Petitioner's trial was therefore never "closed" in violation of the Sixth Amendment, and his claim that he was denied a public trial must fail.

### III. *Instruction on Lesser Included Offenses*

Petitioner next claims that he was deprived of due process because the trial judge refused to instruct the jury on the lesser included offenses of first and second degree manslaughter with respect to the Littman murder. Petitioner argued to the trial court that the "tenuous nature of the evidence" regarding his role in the Littman murder justified a jury finding that he did not have the specific intent to commit murder, and that the manslaughter charge was therefore appropriate. *See State v. Herring,* 210 Conn. at 104–05, 554 A.2d at 699–700. He claimed that Glenda Hightower's testimony regarding petitioner's statement that Littman had "to go" could have been interpreted by the jury as meaning only that Littman has "got to leave," and that Graylon Shannon's testimony indicated that petitioner confessed not to killing Littman, but only to helping dispose of his body. The trial court rejected petitioner's argument and found that a manslaughter instruction was not warranted by the evidence.

■ On appeal, petitioner offers a different justification for the manslaughter instruction. He now argues that the jury could have concluded from the evidence that Littman was "killed during a sudden violent altercation in which the intent necessary for a murder conviction had been lacking." However, petitioner did not make this argument to the state trial court. Under Connecticut law, an appeals court should not review a justification for a lesser included offense that was not raised at trial. *Id.* The Connecticut Supreme Court, in upholding the trial court's determination that the evidence on intent was not sufficiently disputed to warrant the manslaughter instruction, explicitly declined to address any evidentiary

grounds not raised in the trial court. *Id.* at 105, 554 A.2d at 699–700. Therefore, petitioner's claim based on the "altercation" evidence was procedurally defaulted by his failure to raise it in state court, and, as no cause has been offered to justify the default, we decline to address it on this appeal. *See Smith v. Murray,* 477 U.S. 527, 533, 106 S.Ct. 2661, 2666, 91 L.Ed.2d 434 (1986).

## CONCLUSION

We have examined petitioner's remaining claims, and affirm substantially for the reasons stated in the Magistrate Judge's opinion and adopted by the district court. Accordingly, the judgment of the district court is affirmed.