## COMMONWEALTH *vs.* JASON PATRY.

No. 97-P-1696.

Plymouth. October 14, 1998. - January 24, 2000.

Present: BROWN, SMITH, & BECK, JJ.

*Constitutional Law,* Public trial, Waiver of constitutional rights. *Practice, Criminal,* Instructions to jury. *Judge. Jury and Jurors.*

A Superior Court judge erred in giving supplemental instructions to the jury in answer to their questions without the defendant being present or having waived his presence; the error, which constituted a violation of the defendant's Sixth Amendment right to a public trial, was not harmless and a new trial was required. [474-475, 476]

INDICTMENTS found and returned in the Superior Court Department on July 26, 1994.

The cases were tried before *Barbara A. Dortch-Okara,* J.

*Edward P. Mulvaney* for the defendant.

*Mary E. Mullaney,* Assistant District Attorney, for the Commonwealth.

SMITH, J. The defendant was charged in five indictments, one for motor vehicle homicide, and the remaining four for assault with a dangerous weapon (a motor vehicle). A Superior Court jury returned not guilty verdicts on the indictments charging him with motor vehicle homicide and two of the assaults with a dangerous weapon. He was found guilty on the remaining assault indictments; the victims of those assaults were the deceased, Paul Hightower, and Michael Clinton.

On appeal, the defendant raises several issues. He claims that the judge committed error in (1) entering the jury room on three separate occasions to answer the deliberating jury's questions, violating the defendant's right to a public trial; (2) instructing the jury when the defendant was not present; (3) failing to punish the Commonwealth for violating a sequestration order; (4) allowing the Commonwealth's expert to offer an opinion that an

assault had taken place; and (5) sentencing the defendant for conduct of which he was acquitted. The defendant also claims that his trial counsel was ineffective in representing him.

We summarize the evidence presented by the Commonwealth. On March 25, 1994, the defendant was driving an automobile in Brockton when he skidded and swerved around a corner onto Pine Street. The car fishtailed and its tires squealed. He came very close to hitting Michael Clinton, Richard Pierce, and Roger Murphy, who were walking in the road. Clinton yelled at the defendant to slow down, using profane language. The defendant yelled back, and then placed his car in reverse and accelerated it backwards, directly at the three men. Clinton had to move rapidly to the side of the road to avoid being hit. The car struck a chain link fence putting a large dent in it, and then drove away.

The defendant turned down a dead end street (North Leyden), placed the car in reverse, backed up at a high rate of speed and drove his car back onto Pine Street. He zigzagged across the road toward the three men. Clinton had to jump out of the car's path to avoid being hit. As the car attempted to leave the scene, Clinton threw a rock and hit it.

The defendant later returned to Pine Street after the three men had left. At that time, the deceased, Paul Hightower, had arrived at the home where the fence had been damaged. While talking with its owner, the defendant's car drove by at a high rate of speed. Hightower, who was accompanied by his fifteen year old daughter and a three year old girl, decided to follow the defendant's car in his van and get the license plate number.

The two vehicles proceeded down North Leyden Street. When they reached the dead end, the defendant attempted to back his car up, but Hightower's van blocked its escape. The defendant maneuvered his car around the van by driving over a lawn. Once behind the van, the car pulled up to its bumper, thereby cornering Hightower's vehicle. Hightower continued to pull away from the car (moving toward the dead end), but the car stayed at the van's bumper. Hightower emerged from the van and shouted to the defendant, "I've got two kids in the car." The car then apparently backed up, and drove directly at Hightower at a high rate of speed. Hightower jumped in front of the van to avoid being hit. After the car had passed, Hightower moved away from the van, but the car once again drove at Hightower, causing him to run approximately ten feet into the

woods; the car stopped at the edge of the woods. Another resident of the neighborhood came out onto the street and began yelling at the defendant. The defendant drove away toward Pine Street.

As the defendant was turning the corner from North Leyden Street, the police were traveling up Pine Street. The defendant swerved into the lane of oncoming traffic (in front of the police cruiser), and stopped. The defendant told the police that he was being chased. He was subsequently arrested.

Meanwhile, Hightower drove his van to the corner of North Leyden and Pine Streets. Coughing and breathing hard, Hightower told the police that the defendant almost hit him and tried to run him over. Hightower then leaned out of the door of the van and appeared to be in pain. He began spitting up blood, and collapsed on the ground where he died of a heart attack.

In his defense, the defendant presented a different account of events. He testified that after work he had had a few beers and was driving to meet a friend in Brockton. While traveling on Pine Street, he saw three men walking down the middle of the street toward his vehicle. The defendant slowed down and passed the men who were cursing at him. Upon arriving where he was to meet his friend, the defendant found that he was not there. The defendant therefore turned around and proceeded back toward Pine Street. When he stopped at a stop sign, two men suddenly appeared and began hurling rocks at his vehicle. He saw a third man who threw a rock directly at him.[1] The defendant claimed that he hit a fence in his efforts to avoid the rocks and escape from the attack. The defendant fled from the scene, but noticed a van pursuing him. The van blocked the defendant's vehicle in a dead end street, and a few moments later, someone attempted to open his car door and reach in for him. The defendant placed the car in reverse, hit the accelerator and was able to escape. The defendant then drove down Pine Street where he noticed a police cruiser. He flagged down the cruiser but, according to the defendant, they were only interested in whether he had been drinking.

The jury began its deliberations on a Friday. That day the jury had a question about, among other things, the legal definition of "assault." The judge answered the question in open

---

[1]The defendant testified that the three men appeared to be the same people he had previously encountered.

court with the defendant present. Deliberations were then suspended for the weekend.

On Monday, the jury asked two more questions. One inquired whether there had "to be an attempt and/or intent to assault someone." The other question requested the judge to again define "reasonable doubt." The judge held a lobby conference with both counsel present. She said that she would like to "go directly into the deliberating room and address these questions." The judge and the lawyers then discussed the appropriate answers to the jury's questions. At the conclusion of the discussion, the prosecutor asked whether he and defense counsel would also be present in the deliberation room while she gave to the jury her supplemental instructions. The judge made clear that she intended counsel to be present and explained: "It's because the courtroom is being used. So, we will go in to deal with it. We'll use that room as a courtroom unless you can come up with another space." The prosecutor responded, "Oh, no, I think that's a fabulous idea." Defense counsel immediately waived the defendant's presence in the jury deliberation room.

The judge, the two lawyers, and the court reporter, but not the defendant, then went into the jury deliberation room. The judge proceeded to inform the jurors as follows:

> "I have convened in your deliberation room because we're doing other things in the courtroom, and it's more convenient. We don't have extra space in a different courtroom to do [it]."

The judge further explained that she had started another trial, that she was engaged in impaneling a jury, and that it was "hard to find a convenient point to break during the impanelment procedure." She did not offer any explanation concerning the defendant's absence and neither the prosecutor nor the defense counsel requested that she do so. The judge then answered the questions that the jury had previously sent her. Thereafter, the judge and the attorneys left the jury room.

After the jury resumed their deliberations, they had another question, this time on the elements of motor vehicle homicide. The judge again entered the jury deliberation room with counsel, but not with the defendant, and answered the question.

The jury then communicated to the judge that they had reached verdicts on four of the five charges. In response to the

jury's failure to reach a verdict on the remaining charge, the judge again went into the jury deliberation room with counsel but without the defendant, and gave the jury the *"Tuey/ Rodriquez"* charge. See *Commonwealth* v. *Tuey,* 8 Cush. 1 (1851); *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 101-102 (1973).

In sum, the judge entered the jury deliberation room three times to give instructions to the jury.

1. *Violation of the defendant's right to a public trial.* The defendant argues that his right to a public trial was violated when the judge gave her supplemental instructions to the jury in the privacy of the deliberation room.

The Sixth Amendment to the United States Constitution provides in pertinent part that "the accused shall enjoy the right to a speedy and public trial." *In re Oliver,* 333 U.S. 257, 267 (1948). This right is applicable to State criminal trials. *Ibid.*[2]

"The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ." *In re Oliver, supra* at 270 n.25, quoting from 1 Cooley, Constitutional Limitations 647 (8th ed. 1927). See *Foley* v. *Commonwealth,* 429 Mass. 496, 499 (1999) ("Openness . . . enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system").

The right, in the absence of legitimate reasons for limiting public attendance, extends to the entire trial including the judge's instructions to the jury. See *State* v. *Lawrence,* 167 N.W.2d 912, 915 (Iowa 1969); *State* v. *Pullen,* 266 A.2d 222, 228 (Me. 1970). See also 21A Am. Jur. 2d Criminal Law § 668, at 324 ("The constitutional guarantee of a public trial is held to apply to the entire trial of an accused. The trial, for this purpose, consists of the proceedings for impanelment of the jury, the opening statements of counsel, the presentation of evidence, the arguments, the instructions to the jury, and the return of the verdict").

---

[2]In addition to the explicit Sixth Amendment right of the accused to a public trial, the United States Supreme Court has held that implicit in the First Amendment to the United States Constitution is a qualified right of the press and the public to attend a criminal trial. *Gannett Co.* v. *DePasquale,* 443 U.S. 368, 391-392 (1979).

We hold that in the circumstances present here, it was a violation of the defendant's right to a public trial for the judge to give her supplemental instructions to the jury in the privacy of the jury room.[3]

We recognize that a defendant may waive his constitutional right to a public trial. *Singer* v. *United States*, 380 U.S. 24, 34-35 (1965). However, such a waiver must be knowing, intelligent, and voluntary. *Commonwealth* v. *Adamides*, 37 Mass. App. Ct. 339, 340 n.1 (1994).

There was no waiver here. Defense counsel waived the defendant's presence without ever discussing the issue of his right to a public trial with him. In fact, considering the prosecutor's reaction to the judge's disclosure of her plans ("fabulous"), and defense counsel's immediate waiver of the defendant's presence, it is clear that no one considered the defendant's right to a public trial.

Placing the Constitution to one side, we think that judges should not enter jury rooms at any time to conduct the court's business, even with the parties' consent or at the invitation of the jury. Jury rooms are often small, cramped, and designed to hold a limited number of people.[4] Because of the closeness, the proceedings can easily descend into a sense of informality and intimacy that may not be conducive to the proper administration of justice.

Courtrooms, on the other hand, are designed to accommodate the public. Moreover, the judge's raised bench, the flags, and the distance between the judge and the jury all contribute to maintaining respect and dignity in the court's proceedings.

Finally, it is important for judges to remember that the constitutional right to a public trial grew out of the conviction that "justice must satisfy the appearance of justice." *Levine* v. *United States*, 362 U.S. 610, 616 (1960), quoting from *Offutt* v.

---

[3]The Commonwealth argues that the judge in fact used the jury deliberation room as another "courtroom," and did not exclude the public from attending.

According to the record, each time the judge entered the jury deliberation room, it was from her lobby. There is nothing in the record that indicates that the judge, or someone acting on her behalf, before going into the jury deliberation room, entered the courtroom and informed the members of the public of her plans and invited them to join her in the jury deliberation room.

The fact that she notified counsel of her plans does not, in any manner, convert her actions in entering the jury deliberation room into a public trial.

[4]At oral argument the deliberation room was described as "small."

*United States*, 348 U.S. 11, 14 (1954). When a judge enters a jury deliberation room, it detracts from the appearance of justice which is so essential to the public's confidence in the judicial system.

Violation of the defendant's right to a public trial is a structural error. See *Waller* v. *Georgia*, 467 U.S. 39, 49 n.9 (1984); *Arizona* v. *Fulminante*, 499 U.S. 279, 309 (1991). A structural error is "one that so infringes on a defendant's right to the basic components of a fair trial that it can never be considered harmless." *Commonwealth* v. *Villanueva*, 47 Mass. App. Ct. 905, 906 (1999). Thus, there must be a new trial.[5]

2. *Other issues.* We do not discuss the other issues raised by the defendant, including his right to be present during supplemental jury instructions, see *Commonwealth* v. *DeJesus*, 44 Mass. App. Ct. 349, 350-351 (1998), because we are reasonably confident that they will not arise at his retrial.

> *Judgments reversed.*
>
> *Verdicts set aside.*

---

[5]We are aware that it is customary in the trial court for judges to order that no person may enter or leave the courtroom while the judge is instructing the jury. The reason for the order is to allow the jury to be instructed without being distracted by the comings and goings of the audience.

Such a custom does not deprive the defendant of his or her right to a public trial. See *Herring* v. *Meachum*, 11 F.3d 374, 379-380 (2d Cir. 1993), cert. denied, 511 U.S. 1059 (1994). Spectators are free to attend the entire trial, including the jury instructions, provided that they arrive on time. That practice is a far cry from what occurred here.