163 F.3d 1073
 98 Cal. Daily Op. Serv. 9096, 98 Daily Journal
D.A.R. 12,770
Anthony Cornell BEAN, Petitioner-Appellee/Cross-Appellant,
v.
Arthur CALDERON, Warden, Respondent-Appellant/Cross-Appellee.
 Nos. 97-99023, 97-99024.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 25, 1998.
Decided Dec. 15, 1998.
 
 Andrea Miller, Nageley & Meredith, Inc., Sacramento, California, Andrew S. Love, Law Offices of Coffin & Love, San Francisco, California, for petitioner-appellee/cross-appellant.
 Clayton S. Tanaka, Deputy Attorney General, Sacramento, California, for respondent-appellant/cross-appellee.
 Appeal from the United States District Court for the Eastern District of California' William B. Shubb, District Judge, Presiding. D.C. No. CV-S-90-0648 WBS GGH.
 Before: CANBY, O'SCANNLAIN, and THOMAS, Circuit Judges.
 Opinion by Judge THOMAS; Partial Concurrence and Partial Dissent by Judge O'SCANNLAIN.
 THOMAS, Circuit Judge:
 
 
 1
 Anthony Cornell Bean was convicted of the first-degree murder, robbery, and burglary of Beth Schatz and Eileen Fox and sentenced to death. After the district court granted Bean's habeas petition as to his sentence but denied habeas relief as to his conviction, Warden Calderon appealed and Bean cross-appealed. We reverse the district court's decision as to Bean's conviction for the Fox charges, but otherwise affirm.
 
 
 2
 * A
 
 
 3
 At some point during the early morning hours of June 26, 1980, a disturbance awakened George Schatz in his mobile home in Sacramento, California. Rising from his bed, he saw two young African-American men in his bedroom. One of these men ordered him to lie back down on the bed and forbade him to get up, while the other stood across the room. Schatz lay back down on his bed and stared straight up. He realized at this juncture that his fifty-six-year-old wife, Beth, was not in the bed with him. As Schatz lay without moving in his bed, he heard the noise that the two men were making as they moved around his home, and eventually lost consciousness.
 
 
 4
 When he regained consciousness, he no longer heard any noises. He rose, walked around the bed, and found his wife lying on the floor on her back, naked. Schatz tried to awaken her, only to discover that she was dead. He then called the police, who took him to the hospital. Once there, he realized for the first time that he had been injured: he had sustained six wounds to the head area and one to his neck, a broken nose, and two black eyes. Beth Schatz had died from multiple head wounds, with injuries concentrated on the left side of her skull.
 
 
 5
 Several items of property were missing from the Schatzes' home, including a television set, a deer rifle, a shotgun, George Schatz's wallet, a money clip with $120, a jewelry box containing several pieces of jewelry, and a 1977 Oldsmobile Cutlass automobile. At approximately 9 a.m. on June 26, 1980, the Sacramento Police Department (the "police") recovered the Schatzes' abandoned automobile from a vacant lot about two miles' distance from their home. The police found a ball-peen hammer on the front floorboard of the car, near the passenger seat. A subsequent investigation revealed the presence of human blood and hair on the hammer.
 
 
 6
 After examining the crime scene, the police found "strong indication[s]" that shoes Bean and his brother owned and shared had made shoe prints in a flower bed on the south side of the Schatzes' residence. In addition, a fingerprint on a kitchen window screen that the intruders had removed and a palm print on the kitchen counter were positively identified as belonging to Bean.
 
 
 7
 On July 11, 1980, the police received an anonymous telephone call from a woman who claimed to have personal knowledge that Bean was responsible for the Schatz crimes. The police later learned that this woman had no personal knowledge of the crime, but was merely relaying facts she claimed to have learned from her sister, Cecelia Anders. Anders gave a statement to the police and ultimately testified at Bean's trial. She asserted that Bean and Michael Hamilton had come to her apartment on June 26, 1980, during the early morning. Bean told Anders that he probably had killed a woman that night, saying, "I don't know if I killed that bitch," and "I don't know if she's dead or not." Bean also admitted that he had stolen a rifle and a television set, described the scene of the crimes as a mobile home park, and accurately described the location of the Schatzes' stolen car. Norman Hamilton, Michael's brother and the father of Anders' child, was staying at Anders' apartment on June 26. He also made a statement to the police and testified at trial. In the former, Norman denied hearing Bean admit to hitting or killing a woman, and based any knowledge about the incident on statements by his brother, Michael. However, at trial, Norman claimed Bean had recounted beating a woman.
 
 
 8
 Bean's defense relied on his own testimony that he had attempted to burglarize the Schatzes' residence the morning immediately preceding the homicide, leaving a fingerprint on a window screen and a palm print on the kitchen counter adjacent to his point of entry. The burglary was aborted when Bean heard a toilet flush and became apprehensive that he would be discovered. He testified that he was not present at any time during the Schatz crimes; nor did he attempt to blame Michael Hamilton for those crimes.
 
 B
 
 9
 On June 29, 1980, Eileen Fox, a sixty-five-year-old woman, was found dead in her Sacramento, California residence. After being alerted by Fox's neighbor, the police arrived to find Fox's front door partially open and what appeared to be half of a pair of broken glasses lying on the front porch. Upon entering Fox's home, the police found Fox's dead body lying on the living-room floor just inside the front door, surrounded by the contents of a torn grocery bag. The police also discovered the other half of the broken glasses. Lying next to Fox's body was a pair of brown, plastic-rimmed sunglasses.
 
 
 10
 Fox's death had resulted from a heart attack precipitated by multiple injuries to the face, ear, and head area. The coroner who examined Fox opined that she had been beaten by a blunt object, such as a human fist or foot. On cross-examination, the coroner agreed that all of Fox's head injuries were consistent with an unbroken fall, except for a single injury to her left ear.
 
 
 11
 The next day, June 30, 1980, Fox's car was found with the keys in the ignition, in a parking lot approximately one and one-quarter miles from her home. Her purse was lying on the passenger side of the front floorboard, and her wallet was retrieved from an ivy bed not far from where the car was parked.
 
 
 12
 At trial, the State of California presented evidence of fingerprints that had been recovered from the sunglasses lying beside Fox's body. The prosecution's latent print expert took photographs of one of the lenses of the sunglasses before attempting to lift any latent print. After taking these photographs, he made three "lifts" from the glass lens by applying fingerprint lift tape. The tape containing these "lifts" was placed on a fingerprint card, and the examining officers determined that the "lifts" could not contribute to any identification. After the third lift, photographs were taken of the remaining residue on the lens. Based on one of these photographs, four prosecution experts identified the print as matching the third finger of Bean's left hand. However, Bean's experts contested this identification, all agreeing that the print originally visible on the sunglasses was a composite of several overlaid prints.
 
 
 13
 In addition to this fingerprint evidence, the State called Fox's neighbor, Mary Williams, as a witness. Williams testified that she had seen Bean sitting in bushes in the park across the street from Fox's residence on three separate occasions. The last time she had noticed Bean had been three weeks before Fox's murder.
 
 C
 
 14
 After being presented with evidence on both the Schatz and Fox crimes, a Sacramento County jury convicted Bean of the following charges: (1) two counts of first degree murder for Beth Schatz and Eileen Fox; (2) one count of assault with a deadly weapon on George Schatz; (3) two counts of burglary; and (4) two counts of robbery. The jury also found true three special circumstances: (1) the murders were committed during the commission of a robbery; (2) the murders were committed during the commission of a burglary; and (3) both murders were of the first degree and Bean stood convicted of multiple murder.
 
 
 15
 During the penalty phase of the trial, the prosecution presented two aggravating circumstances: a prior burglary conviction, and an incident in which Bean allegedly fired a sawed-off shotgun at two men in a car. The jury subsequently returned a verdict of death for the Schatz murder, and a verdict of life in prison without the possibility of parole for the Fox murder.
 
 
 16
 On direct appeal, the California Supreme Court affirmed Bean's conviction and sentence in their entirety. See People v. Bean, 46 Cal.3d 919, 251 Cal.Rptr. 467, 760 P.2d 996 (Cal.1988), cert. denied, 494 U.S. 1038, 110 S.Ct. 1499, 108 L.Ed.2d 634 (1990). After the Superior Court of Sacramento County scheduled Bean's execution, the United States District Court for the Eastern District of California entered an order staying the execution to permit appointment of counsel to represent Bean in federal habeas corpus proceedings.
 
 
 17
 Bean then filed a federal petition for writ of habeas corpus under 28 U.S.C. § 2254, whereupon the federal district court granted a stay of execution to permit Bean to exhaust his state remedies. In response, Bean filed a petition for writ of habeas corpus in the California Supreme Court, which the court denied "on the ground that it is untimely, does not identify those claims regarding which petitioner lacked knowledge or advise when he became aware of the factual basis for those claims, and does not adequately explain the delay in investigating and presenting the claims." See In re Bean, No. S040182 (Cal. Feb. 23, 1995). As support for this assertion, the court cited In re Clark, 5 Cal.4th 750, 21 Cal.Rptr.2d 509, 855 P.2d 729 (Cal.1993).
 
 
 18
 After exhausting his state remedies, Bean filed an amended federal habeas corpus petition. Respondent Calderon (also referred to herein as the "State") filed a motion to dismiss the petition, arguing that the grounds on which the California Supreme Court denied the petition were sufficiently adequate and independent to bar federal review. The district court denied the State's motion to dismiss because, among other reasons, California's timeliness rule was not clear enough at the time of Bean's purported procedural default to foreclose federal review on the merits. Agreeing with this rationale, we subsequently denied the State's petition for a writ of mandamus directing the district court to vacate its order. Calderon v. United States Dist. Court, 96 F.3d 1126 (9th Cir.1996), cert. denied, 520 U.S. 1204, 117 S.Ct. 1569, 137 L.Ed.2d 714 (1997).
 
 
 19
 After remand, the parties adopted a stipulation regarding the propriety of an evidentiary hearing on certain claims, including the ineffectiveness of trial counsel at the guilt and penalty phases of trial. After an eight-day evidentiary hearing, the magistrate judge recommended that the district court grant habeas relief with respect to Bean's death sentence, observing that Bean's penalty-phase counsel had rendered ineffective assistance by failing adequately to investigate and present a case in mitigation. The magistrate judge recommended the denial of habeas relief as to Bean's conviction.
 
 
 20
 The district court entered its judgment vacating and setting aside Bean's sentence of death because of the ineffective assistance of counsel he had received during the penalty phase of his trial. In accordance with the magistrate judge's recommendations, the district court denied relief as to the guilt phase.
 
 
 21
 The State appealed, asserting two claims: (1) California's timeliness procedural requirements constituted an adequate and independent state procedural bar to federal merits review; and (2) Bean was not denied the effective assistance of counsel at the penalty phase of his trial. Bean, in turn, filed a notice of cross-appeal raising three arguments: (1) his trial counsel rendered ineffective assistance by failing to prepare a diminished capacity defense to the Schatz crimes and neglecting to investigate the accomplice and prosecution witnesses sufficiently; (2) the joinder of the Schatz and Fox charges violated his due process rights; and (3) there was insufficient evidence to sustain his conviction for the burglary, robbery, and murder of Fox.
 
 
 22
 We review de novo a district court's decision to grant or deny a habeas petition under 28 U.S.C. § 2254, see Smith v. Stewart, 140 F.3d 1263, 1268 (9th Cir.), cert. denied, --- U.S. ----, 119 S.Ct. 336, 142 L.Ed.2d 277 (1998), and the grant of summary judgment, see Belgarde v. Montana, 123 F.3d 1210, 1214 (9th Cir.1997). Because Bean filed his habeas petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-122, 100 Stat. 1214 ("AEDPA"), the provisions of the AEDPA do not apply to this case. Jeffries v. Wood, 114 F.3d 1484, 1495-96 (9th Cir.) (en banc), cert. denied, --- U.S. ----, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997); accord Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2068, 138 L.Ed.2d 481 (1997).
 
 II
 
 23
 We initially must reject the State's claim that Bean procedurally defaulted his claim of ineffective assistance of counsel at the penalty phase, and therefore cannot receive federal review of it. In Calderon v. United States District Court, a prior decision in this case, we addressed the precise assertion the State seeks to raise anew here "that California courts regularly and consistently applied the timeliness procedural bar even before Clark." Calderon v. United States Dist. Court, 96 F.3d 1126, 1130 (9th Cir.1996) [hereinafter Bean I ]. We held that "California's timeliness rule, at least as applied to a pre-Clark procedural default" like Bean's, "does not provide an adequate state ground barring federal review on the merits." Id. at 1131.
 
 
 24
 In this appeal, the State offers no new rationale for revisiting this issue, content simply to reiterate the argument it lost in Bean I. Because we have previously resolved this precise issue, the State's argument founders on the jurisprudential doctrine of law of the case, "under which an appellate court does not reconsider matters resolved on a prior appeal." Jeffries v. Wood, 114 F.3d 1484, 1488-89 (9th Cir.1997) (en banc). Heeding the interests of consistency and finality, see Jeffries, 114 F.3d at 1489, we accordingly decline to disturb our own previous resolution of this procedural dispute.
 
 III
 
 25
 * The district court correctly concluded that Bean received ineffective assistance of counsel at the penalty phase of his trial. To establish ineffectiveness of counsel, Bean must demonstrate that his counsel's performance at the penalty phase of his trial was deficient, and that the deficient performance prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687-90, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 
 
 26
 Bean's penalty-phase defense was disorganized and cursory. A month and a half before the penalty phase, the court had appointed Harold Machen to serve as Bean's counsel for the penalty phase along with Thomas Roehr, the attorney who had represented Bean during the guilt phase of his trial. Yet during this month and a half, Machen engaged in no preparation for the penalty phase and conducted no investigation of penalty-phase issues. Instead, Machen chose to rely entirely upon the information Roehr had previously amassed concerning a potential competency defense. This deficiency was not remedied by Roehr, who apparently believed that the trial judge had prohibited him from participating in any aspect of the penalty phase, except for argument. He therefore virtually abdicated responsibility for the penalty phase, leaving its preparation and presentation to Machen.
 
 
 27
 The two attorneys' confusion over their respective roles exacerbated deficiencies in the development of mitigating evidence. Before Bean's trial, Roehr contacted two mental health experts, Dr. Axelrad, a psychiatrist, and Dr. Weissman, a clinical psychologist, for opinions on Bean's mental state. Both doctors strongly recommended further neuropsychological testing to elucidate the impact of organic brain damage on Bean's cognitive functioning. In fact, Dr. Axelrad specifically suggested the name of a well-respected Sacramento psychologist who could administer the neuropsychological tests. However, no such testing occurred until the weekend immediately preceding the penalty phase, approximately ten months later, when Roehr contacted Dr. Axelrad, who agreed to arrange for Dr. Blunt, a neuropsychologist, to perform the tests. Consequently, both Roehr and Machen were unaware of the results of that testing when the penalty phase began.
 
 
 28
 In addition to delaying for over ten months in following the explicit recommendations of two mental health experts, Bean's counsel failed to furnish other necessary information to the experts who testified during the penalty phase, and failed to prepare these experts adequately for their testimony. Dr. Axelrad, the only mental health expert who had reviewed any documents regarding Bean's life history, did not testify. Dr. Weissman, who had earlier requested information about Bean's offenses and his social, medical, and educational history, received no case-related material from Bean's counsel, apart from a written report of the neuropsychological tests Dr. Blunt had performed. Bean's counsel did not contact Dr. Weissman to prepare him for the penalty phase until a day or two before his testimony, when he expended only one or two hours in readying his testimony. At the penalty phase, Dr. Weissman could not definitively opine whether Bean had suffered brain damage and whether Bean was able to appreciate the criminality of his conduct, but could merely testify that Bean suffered from an organic personality disorder and was moderately defective in intelligence. Similarly, Dr. Blunt, who also appeared at the penalty phase, did not review the facts of Bean's case before testifying on the basis of her last-minute testing that Bean had moderate brain damage. In addition, while voicing her belief that Bean was definitely impaired in his ability to appreciate the criminality of his conduct, she admitted that she had not studied the relevant California legal standards. In sum, the penalty phase defense was at best woefully ineffective; at worst, deleterious.
 
 
 29
 In contrast, at Bean's 1996 district court evidentiary hearing, Bean's counsel presented abundant new mental health evidence showing that Bean was functionally mentally retarded; that he suffered from post-traumatic stress disorder, based upon his childhood experiences; that he was brain-damaged; that his drug usage precluded him from forming the intent to kill, rob, or burglarize; and that he was incompetent to stand trial. Drs. Axelrad, Weissman, and Blunt also gave newly definitive and expansive opinions on Bean's mental impairments, based on the information about Bean's social history and other recent testing that was newly available to them. Dr. Axelrad concluded that Bean was unable to function normally and that his probable drug use would have prevented him from forming the intent to kill or rob on the dates of the murders. Rejecting his pre-trial conclusion that Bean was competent, Dr. Weissman opined that Bean had been suffering from serious mental deficiencies at the time of the crimes. Finally, Dr. Blunt reaffirmed her previous finding of brain damage and asserted that Bean had not been competent to stand trial in 1981.
 
 
 30
 None of the conclusions reached by the experts testifying at the federal habeas hearing were unavailable to trial counsel. Indeed, as Dr. Weissman stated in his affidavit:
 
 
 31
 Had I been provided the kind of material I now have and that I requested in 1980 following my initial evaluation of Mr. Bean and given an opportunity to review it, I would have testified that Mr. Bean exhibited substantial physical, mental, and emotional impairments that were relevant to each of the above sentencing factors in mitigation.
 
 
 32
 Failure to present mitigating evidence at the penalty phase of a capital case constitutes ineffective assistance of counsel. See, e.g., Smith v. Stewart, 140 F.3d 1263, 1268 (9th Cir.) ("It is undisputed that trial counsel presented no mitigating evidence at the presentencing hearing ...."), cert. denied, --- U.S. ----, 119 S.Ct. 336, 142 L.Ed.2d 277 (1998); Correll v. Stewart, 137 F.3d 1404, 1412 (9th Cir.) ("[T]he transcript of the pre-sentencing hearing reveals that Correll's attorney failed to call witnesses or present any evidence at the pre-sentencing hearing, although he stated on the record that he knew of people who were willing to testify on Correll's behalf."), cert. denied, --- U.S. ----, 119 S.Ct. 450, --- L.Ed.2d ---- (1998); Clabourne v. Lewis, 64 F.3d 1373, 1384 (9th Cir.1995) ("[The defendant's counsel] did not call any witnesses, introduce any evidence of [the defendant's] history of mental illness, or argue any mitigating circumstance besides [the defendant's] mental condition at the time of the offense.").
 
 
 33
 Although some mitigating evidence was presented, the representation in this case "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688, 104 S.Ct. 2052. When experts request necessary information and are denied it, when testing requested by expert witnesses is not performed, and when experts are placed on the stand with virtually no preparation or foundation, a capital defendant has not received effective penalty phase assistance of counsel. These failings were not the product of a reasoned, tactical evaluation. To the contrary, the only explanation offered was one of role confusion. Thus, the collective failure to develop a penalty phase presentation can only be characterized as a deficiency in trial preparation, not a strategic decision. See Kenley v. Armontrout, 937 F.2d 1298, 1304 (8th Cir.1991) ("Failing to interview witnesses or discover mitigating evidence relates to trial preparation and not trial strategy."). Hence, their presentation of their mental health experts' testimony did not arise from the requisite "informed judgment," and constituted ineffective assistance of counsel. See Harris v. Dugger, 874 F.2d 756, 763 (11th Cir.1989).
 
 
 34
 The State asserts that the magistrate judge erred by evaluating the performance of Bean's trial counsel on the basis of "modern competency of counsel standards," rather than 1981 standards, which would have deemed Bean's representation to be constitutionally adequate. However, the State offers no authority for its contention that "[t]he standards of presenting the penalty phase of a death penalty case in 1981 represented the presentation of gross abnormalities versus contemporary standards of presenting a more detailed study of all possible deficiencies."
 
 
 35
 Moreover, we have previously recognized an attorney's duty to investigate and present mitigating evidence of mental impairment in the context of a 1979 capital sentencing hearing. See Evans v. Lewis, 855 F.2d 631, 636-37 (9th Cir.1988). To be sure, ineffective assistance must be evaluated "from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. 2052. However, the ineffectiveness at issue in this case did not arise from failure to employ novel or neoteric tactics. Rather, it resulted from inadequacies in rudimentary trial preparation and presentation: providing experts with requested information, performing recommended testing, conducting an adequate investigation, and preparing witnesses for trial testimony. These were not alien concepts in 1981, but were an integral thread in the fabric of constitutionally effective representation.
 
 
 36
 The State also attacks the magistrate judge's characterization of Machen, rather than Roehr, as lead counsel for the penalty phase. Whatever the merits of this characterization, we regard it as irrelevant to our conclusion that Machen and Roehr's collective failure to elicit mitigating testimony from mental health experts, apparently arising from the belief of each that the other was primarily responsible for preparing the penalty-phase defense, fell "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. 2052; see also Jackson v. Herring, 42 F.3d 1350, 1364 & n. 28, 1366-68 (11th Cir.1995). It is the quality of the assistance received, not the identity of the provider, which is at issue.
 
 
 37
 Finally, the State contends that, given the timing and constraints of Machen's appointment, he was not incompetent for failing to begin preparing for the penalty phase until after the end of the guilt phase. According to the State, these "constraints" included a lack of authorization to participate actively as co-counsel until after the jury delivered its verdict. Belying this interpretation, however, the record reflects simply that Machen would have no part in the guilt phase, apart from having standing to be present at the trial in consultation with Roehr if he so desired. In other words, the trial court imposed no restrictions upon Machen's ability to familiarize himself with Bean's background, to reestablish contact with Drs. Axelrad and Weissman, and to develop a penalty-phase strategy. While there was no investigator assigned exclusively to Machen, the State has offered no reason why Machen could not have coordinated his efforts with those of Roehr's investigator. The limited time between Machen's appointment and the penalty phase, far from excusing Machen's lack of preparation before the penalty phase, made that early preparation all the more crucial.
 
 
 38
 All of these considerations inexorably lead us to agree with the district court and the magistrate judge that Bean did not receive effective assistance of counsel at the penalty phase of his capital trial.
 
 B
 
 39
 It is not enough, of course, for Bean to establish ineffective assistance of counsel. He must also demonstrate that as a result thereof, there was a "reasonable probability that ... the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. For purposes of assessing prejudice, we find more guidance in "those cases in which no mitigating evidence was put on than those cases in which cumulative evidence was put on." Hendricks v. Calderon, 70 F.3d 1032, 1044 (9th Cir.1995) (ruling that defendant was prejudiced by penalty-phase defense in which attorney presented testimony of defendant, defendant's ex-girlfriend, and mental health expert), cert. denied, 517 U.S. 1111, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996).
 
 
 40
 Although Roehr and Machen did elicit the testimony of two experts, the experts' lack of preparation and the limited informational foundation for their conclusions severely undercut their utility to Bean's penalty-phase defense. As the magistrate judge remarked, "Dr. Weissman, the back-up expert, could not be certain of petitioner's problems without further development. Dr. Blunt, while espousing the opinion that petitioner was brain damaged, did so on the basis of last minute tests. Her testimony was less than persuasive at best given this context, and a seeming artifice at worst." These two witnesses therefore "did little to aid in [Bean's] fight for his life." Hendricks, 70 F.3d at 1044.
 
 
 41
 In addition, the family portrait painted at the federal habeas hearing was far different from the unfocused snapshot handed the superior court jury. The jury which committed Bean to death had no knowledge of the indisputably sadistic treatment Bean received as a child, including repeated beatings which left a permanent indentation in his head. Along with numerous other potentially mitigating factors, his developmental delays, including placement in classes for the "educable mentally retarded," were reported to the jury only in the vaguest of terms.[1]
 
 
 42
 Moreover, this is not a case in which a death sentence was inevitable because of the enormity of the aggravating circumstances. Indeed, the prosecution presented scant evidence of aggravating factors: Bean's 1979 burglary conviction and an altercation with two men in which Bean allegedly fired a shotgun. In assessing the potential implication of the mitigating evidence Bean's counsel failed to present, we find it noteworthy that the jury was initially divided over the appropriateness of the death penalty, deadlocking as to both murders before ultimately returning a death verdict for the Schatz case and a verdict of life without parole for the Fox case.
 
 
 43
 All of these considerations "undermine confidence in the outcome" of Bean's penalty phase hearing. Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Faced with more compelling evidence of Bean's mental impairments, therefore, it is reasonably likely that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695-96, 104 S.Ct. 2052.
 
 
 44
 For these reasons, we find the district court properly concluded that Bean sustained his burden of satisfying both the deficient performance and prejudice prongs of Strickland. Hence, we affirm the district court's grant of habeas relief as to Bean's sentence.
 
 IV
 
 45
 The district court and magistrate judge also correctly concluded that Bean did not receive ineffective assistance of counsel during the guilt phase of his trial. Bean bases his ineffective-assistance claim on two grounds: first, that Roehr unreasonably rejected a potential diminished capacity defense to the Schatz crimes; and second, that Roehr failed to investigate Bean's alleged accomplice and key prosecution witnesses who testified about the Schatz offenses. Because neither allegation fulfills both prongs of the Strickland standard, we decline to grant habeas relief to Bean on the basis of guilt-phase ineffectiveness of counsel.
 
 
 46
 * Bean initially contends that Roehr was ineffective for failing to pursue a diminished capacity defense to the Schatz crimes. Pointing to the uncontested fingerprint evidence and the two prosecution witnesses who testified about his confession, Bean argues that Roehr erred in advancing an alibi defense on his behalf. Instead, Bean asserts, a reasonably competent attorney would have presented evidence showing that Bean's mental impairments, coupled with his habitual use of PCP, incapacitated him from forming the requisite intent for the crimes with which he was charged. According to Bean, because Roehr failed to investigate Bean's background thoroughly, he unreasonably rejected a diminished capacity defense.
 
 
 47
 These contentions fail to establish that Roehr's performance was deficient. On the contrary, because the diminished capacity defense Bean proposes would have conflicted with the alibi theory, "it was within the broad range of professionally competent assistance for [Roehr] to choose not to present psychiatric evidence which would have contradicted the primary defense theory." Correll v. Stewart, 137 F.3d 1404, 1411 (9th Cir.), cert. denied, --- U.S. ----, 119 S.Ct. 450, --- L.Ed.2d ---- (1998). To the extent that Bean challenges Roehr's decision to forgo the diminished capacity defense in favor of the alibi defense, this challenge is misplaced. In light of Bean's assertion to Roehr that he had not been at the Schatz residence at the time of the crimes, his reluctance to blame his alleged co-burglar, and his own refusal to adopt the diminished capacity defense, Roehr made a reasonable strategic choice to present an alibi defense. Once Roehr reasonably chose that theory, largely on the basis of Bean's own representations, his duty to investigate the directly conflicting diminished capacity defense was at an end. See Turk v. White, 116 F.3d 1264, 1267 (9th Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1073, 140 L.Ed.2d 132 (1998); but see Johnson v. Baldwin, 114 F.3d 835, 839-40 (9th Cir.1997) (holding that under the circumstances of that case, an unreasonable failure to investigate and discredit a weak alibi defense was prejudicial ineffective assistance of counsel).
 
 B
 
 48
 Bean further argues that Roehr was deficient in failing to investigate fully his alleged accomplice in the Schatz crimes, Michael Hamilton, and the key prosecution witnesses in that case, Cecelia Anders and Norman Hamilton. Like Bean's first basis for his ineffective-assistance claim, this argument fails to establish that Roehr's performance was deficient.
 
 
 49
 At the outset, although Bean asserts that a reasonable investigation would have enabled Roehr to present evidence suggesting that Michael Hamilton was Beth Schatz's actual killer, he bases this contention on the premise that he and Michael Hamilton were both present at the scene of the Schatz crimes--a premise that would have conflicted with his primary alibi defense. Even in the absence of such a conflict, a reasonable investigation would not have necessarily unearthed evidence that Michael Hamilton was the true murderer. Bean did not seek to blame his alleged co-burglar for the murder in his trial testimony, and the record does not reflect evidence, apart from George Schatz's recollection of "two" males in his residence, pointing to Michael Hamilton's guilt. Rather, any effort to shift the blame for Schatz's murder onto Michael Hamilton's shoulders would have had to overcome the statements by Anders and Norman Hamilton, recounting Bean's admission that he had killed Beth Schatz. Thus, Roehr's representation did not "f[a]ll below an objective standard of reasonableness." Strickland, 466 U.S. at 688, 104 S.Ct. 2052.
 
 
 50
 Nor may Bean rest his ineffective-assistance claim upon Roehr's supposed failure to investigate Anders and Norman Hamilton properly. Contrary to Bean's assertion, Roehr did interview Norman Hamilton. While Bean emphasizes the timing of that interview--April 21, 1981, the day before jury selection--we note that the jury did not render its verdict until June 8, 1981, a month and a half later. Had any significant facts disproving Bean's guilt emerged from the interview with Norman Hamilton, Roehr would have had ample time to present them to the jury. Furthermore, Bean offers no concrete support for his speculation that Roehr could have uncovered the police manipulation that allegedly prompted Norman Hamilton to testify against Bean at trial.
 
 
 51
 In comparison, although one might question the strategic character of Roehr's decision not to interview Anders, Anders' 1996 declaration proffers no reason for discounting her trial testimony against Bean and does not explain her decision to recant that testimony, beyond baldly stating that she lied at Bean's trial. Thus, there is no "reasonable probability that ... the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. There is no sign that, even had Roehr interviewed Anders, he could have persuaded her to change her testimony in 1981. Even if we assume that Roehr's decision not to interview Anders was deficient, therefore, Bean cannot show that this decision prejudiced his defense.
 
 V
 
 52
 After careful examination of the record, we conclude that joinder of the Schatz and Fox indictments deprived Bean of a fundamentally fair trial on the Fox charges. Consolidation of the relatively weak Fox case with the compelling Schatz charges in a single trial violated Bean's right to due process by leading the jury to infer criminal propensity. This impermissible inference, in turn, allowed the jury to rely upon the Schatz evidence to strengthen the otherwise weak case against him for the Fox offenses. Because the joinder was constitutionally impermissible, we reverse Bean's conviction of the Fox charges.[2]
 
 
 53
 * Before we assess the legal merits of Bean's due process claim, it is useful to revisit the relevant factual and procedural history. At the trial level, Bean twice attempted to sever the Schatz and Fox charges on two grounds: the evidence for each case was not admissible in the other; and the relatively stronger evidence of Bean's guilt in the Schatz case could bolster the relatively meager evidence of Bean's guilt in the Fox case. Determining that there was a "considerable similarity" between the two sets of offenses, the trial court determined that no prejudice was likely to result from the joinder, and that any prejudice that did arise could be minimized through jury instructions.
 
 
 54
 During its closing argument at trial, the State repeatedly urged the jury to consider evidence of Bean's "modus operandi" to determine whether he was guilty of both the Schatz and Fox crimes. For instance, the State argued that "having done it once, it made it that much easier three days later and about 10 blocks away for [Bean] to murder Mrs. Eileen Fox." Similarly, the State commented upon "the similarity of the two crimes," and asserted that Bean was guilty of the Fox offenses because "the theft of her car and the manner in which it was perpetrated suits his style and his M.O., as you are well aware of it...."
 
 
 55
 For its part, the trial court delivered several instructions that could have applied only to the Schatz crimes without explaining which instruction applied to which set of offenses. For instance, the jury was instructed regarding the liability of principals and aiders and abetters, as well as a felony-murder theory in which proof of a conspiracy establishes the guilt of all conspirators, without reference to the crime to which the instruction applied. The sole instruction that addressed the existence of multiple counts read as follows: "Each count charges a distinct offense. You must decide each count separately. The defendant must be found guilty or not guilty of any or all of the offenses charged. Your findings as to each count must be stated in a separate verdict."
 
 
 56
 On direct appeal, the California Supreme Court disagreed with the trial court's conclusion on cross-admissibility, finding that "the manner in which the crimes were committed was not sufficiently similar to reflect a common modus operandi." People v. Bean, 46 Cal.3d 919, 251 Cal.Rptr. 467, 760 P.2d 996, 1005 (Cal.1988). Thus, "evidence of each murder was not admissible to establish the identity of the killer and was not 'cross-admissible.' " Id. At the same time, the court ruled that the trial court had properly denied Bean's motion for severance, and that the joinder of the Schatz and Fox crimes did not require reversal of Bean's conviction. Id. at 1009. As support for this ruling, the court relied upon two factors: in the court's estimation, neither set of offenses was more inflammatory or rested upon much greater evidence than the other; and the state received "significant" benefits from joinder. Id. at 1008.
 
 
 57
 On September 13, 1995, having filed his amended federal habeas petition, Bean moved for summary judgment on the bases that the joinder of the Schatz and Fox charges resulted in a fundamentally unfair trial, and that there was insufficient evidence to convict him of the Fox offenses. Although the magistrate judge recommended summary judgment for Bean on the issue of whether the joinder had unfairly tainted his trial on the Fox charges, the district court rejected this recommendation in a May 8, 1996 memorandum and order. Bean now appeals to us to reverse this ruling.
 
 B
 
 58
 In evaluating Bean's claim of constitutionally impermissible joinder, we apply the following test:
 
 
 59
 [t]he propriety of a consolidation rests within the sound discretion of the state trial judge. The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.
 
 
 60
 Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir.1991) (finding that because habeas petitioner's trial was not prejudiced by joinder, no fundamental unfairness resulted) (alteration in original) (citation omitted). Accordingly, misjoinder must have "result[ed] in prejudice so great as to deny [Bean] his Fifth Amendment right to a fair trial" in order for us to find that Bean suffered a constitutional violation. United States v. Lane, 474 U.S. 438, 446 n. 8, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). As the joinder of the Schatz and Fox charges did in fact prejudice Bean's trial on the latter counts, we conclude that Bean's due process rights were violated.
 
 
 61
 We have previously acknowledged that there is "a high risk of undue prejudice whenever ... joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." United States v. Lewis, 787 F.2d 1318, 1322 (9th Cir.1986) (citation omitted). In Lewis, we explained this risk by observing that "[i]t is much more difficult for jurors to compartmentalize damaging information about one defendant derived from joined counts, than it is to compartmentalize evidence against separate defendants joined for trial," and by recognizing studies establishing "that joinder of counts tends to prejudice jurors' perceptions of the defendant and of the strength of the evidence on both sides of the case." Id. at 1322.
 
 
 62
 These concerns resonate with particular force here: not only did the trial court join counts for which the evidence was not cross-admissible, but the State repeatedly encouraged the jury to consider the two sets of charges in concert, as reflecting the modus operandi characteristic of Bean's criminal activities. Thus, the jury could not "reasonably [have been] expected to 'compartmentalize the evidence' so that evidence of one crime [did] not taint the jury's consideration of another crime," United States v. Johnson, 820 F.2d 1065, 1071 (9th Cir.1987), when the State's closing argument and the import of several of the instructions it heard urged it to do just the opposite.
 
 
 63
 The general instructions the trial court issued availed little in ameliorating the prejudice arising from joinder. We have expressed our skepticism about the efficacy of such instructions on at least one prior occasion: "To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities." Lewis, 787 F.2d at 1323 (quoting United States v. Daniels, 770 F.2d 1111, 1118 (D.C.Cir.1985)). Apart from the intrinsic shortcomings of such instructions, however, the instructions here did not specifically admonish the jurors that they could not consider evidence of one set of offenses as evidence establishing the other. In fact, such an admonition would have conflicted with the trial court's conclusion that the offenses evinced "considerable similarity." Here, moreover, the jury received its instructions "in the waning moments of the trial," a factor that further diminished their impact. See Lewis, 787 F.2d at 1323; cf. Herring v. Meachum, 11 F.3d 374, 378 (2d Cir.1993) (finding that habeas petitioner had not made required showing of actual prejudice, based partly on fact that jury "was instructed on three separate occasions that evidence of one murder was not to be used to determine petitioner's guilt with respect to the other").
 
 
 64
 We agree with Bean that prejudice resulted from the disparity between the evidence supporting his guilt of the Schatz crimes and the proof of his guilt of the Fox offenses. The evidence connecting Bean to the Schatz crimes included his undisputed fingerprint on the kitchen window screen; his undisputed partial palm print on the kitchen counter; tennis shoe imprints matching shoes he shared with his brother; and his statements to Norman Hamilton and Anders, revealing his role in assaulting Beth Schatz and in robbing the Schatzes.
 
 
 65
 By contrast, the sole direct evidence of Bean's complicity in the Fox offenses involved a fingerprint on broken sunglasses found beside Eileen Fox's body, a fingerprint that Bean vigorously disputed at trial through expert testimony. Apart from the fingerprint evidence, the jury considered Bean's own ambiguous and contradictory statements about ownership of similar sunglasses; the testimony of Eileen Fox's neighbor that Bean had been in Fox's neighborhood on three occasions, including one incident in which the neighbor saw him hiding in some bushes across from Fox's residence; the presence of a hair on the sunglasses consistent with Fox's hair; and Bean's familiarity with the area where Fox's stolen property had been discarded. This substantial disparity between the Schatz evidence and the Fox evidence prompts us to conclude that the strong evidence of Bean's guilt in the Schatz crimes tainted the jury's consideration of Bean's complicity in the Fox offenses. See Lucero v. Kerby, 133 F.3d 1299, 1315 (10th Cir.) ("Courts have recognized that the joinder of offenses in a single trial may be prejudicial when there is a great disparity in the amount of evidence underlying the joined offenses. One danger in joining offenses with a disparity of evidence is that the State may be joining a strong evidentiary case with a weaker one in the hope that an overlapping consideration of the evidence [will] lead to convictions on both.") (alteration in original) (citation omitted), cert. denied, --- U.S. ----, 118 S.Ct. 1684, 140 L.Ed.2d 821 (1998); see also Lewis, 787 F.2d at 1322 (considering relative strength of evidence underlying joined charges as factor showing undue prejudice). This creates "the human tendency to draw a conclusion which is impermissible in the law: because he did it before, he must have done it again." United States v. Bagley, 772 F.2d 482, 488 (9th Cir.1985).
 
 
 66
 In concluding that Bean suffered a violation of his constitutional rights, we are mindful that prejudice generally does not arise from joinder when the evidence of each crime is simple and distinct, even in the absence of cross-admissibility. See, e.g., U.S. v. Johnson, 820 F.2d 1065, 1071 (9th Cir.1987) ("[I]n light of the relative simplicity of the issues and the straightforward manner of presentation, we conclude that the district court did not abuse its discretion in denying the defendant's motion to sever the offenses."); Drew v. United States, 331 F.2d 85, 91 (D.C.Cir.1964) ("The federal courts, including our own, have, however, found no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials...."). This determination hinges on the assumption that, if properly instructed, a jury can compartmentalize the evidence, rather than considering it cumulatively, see Johnson, 820 F.2d at 1071; Drew, 331 F.2d at 89, an assumption that cannot apply here, where the jury was not properly charged.
 
 
 67
 This is not a case where acquittal on one joined charge establishes that the jury successfully compartmentalized the evidence. See Featherstone, 948 F.2d at 1503-04 ("[I]t is apparent from the jury's discerning verdict that it followed the court's instructions to regard each count as separate and distinct."); see also Herring, 11 F.3d at 378 ("[T]he jury's acquittal on the ... conspiracy itself goes far toward answering any claim that corroboration on that count improperly motivated the jury's verdict as to the other charges."); Robinson v. Wyrick, 735 F.2d 1091, 1094 (8th Cir.1984) ("In the present case, there has been no showing that [the defendant] was prejudiced; the jury could not find him guilty of ... murder, so it appears that the jurors were able to distinguish the two charges."). In the instant case, no such acquittal offered affirmative evidence of the jury's ability to assess the Schatz and Fox evidence separately.
 
 
 68
 In addition, the State's defense of joinder in this case is exceedingly asthenic. Indeed, the only rationale the State could muster in support of joinder was that it was more convenient for the prosecution to try the disparate cases together. The State virtually concedes the absence of cross-admissibility, the lack of common modus operandi, and the possible prejudicial effect of joinder. Thus, if we were to adopt the State's theory, joinder would never be improper. Against serious concerns about the fundamental fairness of a capital trial, the shallow defense of prosecutorial expedience has a hollow ring.
 
 
 69
 For these reasons, we reverse Bean's conviction of the charges arising from the murder, robbery, and burglary of Eileen Fox. We do not reverse the Schatz conviction because the evidence was so strong that any due process violation in the joinder had no " 'substantial and injurious effect or influence in determining the jury's verdict' " with regard to that offense. Brecht v. Abramson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).
 
 VI
 
 70
 In his final claim of error, Bean attacks the sufficiency of the evidence supporting his conviction of the Fox offenses. Although we reverse that conviction because of prejudicial joinder, we must still evaluate the sufficiency of the underlying evidence, as the Double Jeopardy Clause would preclude retrial if the evidence were insufficient. See Lewis, 787 F.2d at 1323. Accordingly, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Applying this standard, although the evidence was extremely thin, we are compelled to conclude it was sufficient to sustain Bean's conviction of burglarizing, robbing, and murdering Fox.
 
 
 71
 Bean attempts to draw support from our ruling in Mikes v. Borg, 947 F.2d 353 (9th Cir.1991):
 
 
 72
 [I]n a case in which the prosecution's theory is that the defendant's fingerprints were placed on the murder weapon at the time of the commission of the crime or were left at the scene of the crime during its commission, the record must show that the object was inaccessible to the defendant or that the defendant did not have access to the crime scene, during the relevant period prior to the crime's commission.
 
 
 73
 Id. at 361. This reliance is mistaken. As we made clear in Mikes itself, the standard of proof we articulated therein applies only to so-called "fingerprint-only" cases in which the prosecution's exclusive evidence of guilt is the presence of the defendant's fingerprints at the crime scene or on the murder weapon. See id. at 356; see also Taylor v. Stainer, 31 F.3d 907, 909 (9th Cir.1994) (noting that in Mikes, requirements for "a fingerprint-only case" had been described).
 
 
 74
 In contrast, the State here supplemented its admittedly disputed fingerprint evidence with other circumstantial proof of Bean's guilt. A rational trier of fact could have interpreted this evidence as establishing that Bean had investigated Fox's neighborhood well before the crimes, had worn the sunglasses to commit the crimes, and had sought out a familiar location to abandon Fox's stolen property.
 
 
 75
 Indeed, even under the Mikes standard, a trier of fact could have reasonably inferred that Bean's fingerprint was impressed upon the sunglasses at the time of the murder. The hair that was found on the sunglasses suggested that Fox's hair had landed on the sunglasses at the time of the murder, and the sunglasses' broken frame could be construed as evidence of a struggle. While the sunglasses could have acquired Bean's fingerprint in several other ways--a third person murderer might have gained possession of them and worn them while committing the murder, for example--the record does not support this hypothesis, and the state need not eliminate every theory of innocence for Bean's conviction to stand. See Taylor, 31 F.3d at 910. Hence, the evidence was sufficient for a rational factfinder to find Bean guilty beyond a reasonable doubt. See Mikes, 947 F.2d at 356.
 
 
 76
 Bean's conviction of the Fox charges admittedly rests upon fingerprint evidence that Bean's defense experts contested at trial. Our deference to state-court factual findings is arguably less under the pre-AEDPA regime than under 28 U.S.C. § 2254 as amended by the AEDPA.[3] Nevertheless, we must still presume such findings to be correct unless they are "not fairly supported by the record." See 28 U.S.C. § 2254(d)(8) (1996); see also Paradis v. Arave, 130 F.3d 385, 390 (9th Cir.1997) ("Pursuant to 28 U.S.C. § 2254(d), the factual findings of the state court are presumed correct."). The jury convicted Bean of the Fox charges after listening to the testimony of expert prosecution and defense witnesses who offered conflicting opinions on the possibility of using the fingerprint evidence for identification purposes and on whether the fingerprint was Bean's. Because, therefore, the record fairly supports both the inference that Bean left his fingerprint on the sunglasses and the inference that he did not, we decline to disturb the presumption of correctness that section 2254 accords state-court factual findings. We do note, however, that absent the fingerprint evidence, the case against Bean for the Fox offenses would have been considerably weaker, and a rational trier of fact would have been hard-pressed to convict him.
 
 
 77
 In sum, although the Fox evidence was sufficiently weak to warrant reversal on the basis of prejudicial joinder, it was not so weak as to preclude retrial. Thus, given the constraints of habeas review coupled with the extremely deferential standard of review concerning evidence sufficiency, we affirm the district court and magistrate judge's conclusion that the evidence was sufficient to sustain the convictions.
 
 VII
 
 78
 We reverse the district court's decision as to Bean's conviction for the burglary, robbery, and murder of Fox, but affirm the district court's judgment in all other respects. We remand to the district court for entry of an appropriate order for retrial as to the Fox offenses and resentencing as to the Schatz charges.
 
 
 79
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 
 
 80
 O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:
 
 
 81
 I join in most of the Court's opinion but respectfully dissent from Parts III and V. I agree that Bean did not procedurally default his claim of ineffective assistance of counsel, that Bean received effective assistance of counsel at the guilt phase of the trial and that there was sufficient evidence to convict Bean of the Fox murder. I disagree, however, on the two remaining issues: I conclude that Bean received effective assistance of counsel at the penalty phase and that joinder of the Schatz and Fox indictments did not deprive Bean of a fundamentally fair trial.
 
 
 82
 * While I recognize that Bean's representation at the penalty phase was by no means flawless, it did not "so undermine[ ] the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 
 
 83
 The Supreme Court has read the Sixth Amendment right to trial to include a right to counsel. See id. at 685, 104 S.Ct. 2052. To satisfy this right to counsel, it is not enough "that a person who happens to be a lawyer is present at trial alongside the accused." Id. Rather, the "accused is entitled to be assisted by an attorney ... who plays the role necessary to ensure that the trial is fair." Id. The Supreme Court has set a low standard for counsel to qualify as effective because "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but] is simply to ensure that criminal defendants receive a fair trial." Id. at 689, 104 S.Ct. 2052. The Court, therefore, has stated:
 
 
 84
 Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.
 
 Id. The Court cautioned that
 
 85
 The availability of intrusive post-trial inquiry into attorney performance ... would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of the counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected.
 
 
 86
 Id. at 690, 104 S.Ct. 2052. Thus, while we must ensure that an accused has effective counsel at trial and, in Bean's case, at his sentencing hearing, we can do no more than require that the counsel provided was adequate.
 
 
 87
 The Supreme Court's two part Strickland test governs our review of an accused's counsel. It provides that a defendant claiming ineffective assistance must demonstrate that (1) counsel's actions were outside the wide range of professionally competent assistance, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See id. at 687-694, 104 S.Ct. 2052.
 
 
 88
 Bean's counsel was not constitutionally ineffective during the penalty phase. Bean's counsel presented nine witnesses with more than 200 pages of witness testimony (page number includes cross-examination of witnesses), including two psychiatric experts, Dr. Weissman and Dr. Blunt. Dr. Blunt testified that, after performing five neurological tests, she was convinced that Bean was organically brain damaged from three lesions on the brain. This brain damage, she testified, involved an inability to think, to form judgments, to plan or to appreciate the criminality of conduct. Dr. Weissman testified that he had used six different tests on Bean and discovered that Bean was suffering from organic personality disorder and mental retardation (Bean had the mental age of an eight to eleven-year old in terms of "thinking" and "capacity to understand his environment"). Dr. Weissman testified further that, although he had reached no firm conclusion, he found that Bean had "soft signs" of "potentially mild to moderate degree of organic ... brain damage." Counsel's presentation of the two psychiatrists was not, as the majority claims, a "failure to elicit mitigating testimony from mental health experts."
 
 
 89
 Bean's counsel also presented testimony from Bean's family and friends which showed a very poor upbringing. The jury knew that Bean was whipped by his mother, was placed in classes for "slow learners," was suspended from school several times, was made a ward of juvenile court at an early age, left home at age fifteen, and was interned at "Boys Ranch," some sort of juvenile detention center. The jury could also have gleaned from the testimony that Bean's father hit or whipped Bean, even though Bean's father denied beating Bean when asked directly.[1]
 
 
 90
 Bean alleged that his counsel inadequately investigated his background, inexcusably delayed his neuropsychological testing, inadequately prepared the witnesses, asked the expert witnesses the wrong questions and, overall, failed to present a compelling or reliable mitigation argument. Bean is correct that his counsel did a less than perfect job during the penalty phase. They could have presented Bean's mitigating evidence in greater and more compelling detail. Their inadequacies, however, do not " 'amount[ ] in every respect to no representation at all.' " Clabourne v. Lewis, 64 F.3d 1373, 1387 (9th Cir.1995) (quoting Blake v. Kemp, 758 F.2d 523, 533 (11th Cir.1985)). Bean's arguments would have greater merit if the issue before this court were whether Bean's counsel did a good job during the penalty phase of his trial. The issue here is, however, whether Bean's counsel was constitutionally competent, a much lower standard.
 
 
 91
 This case differs markedly from other recent cases in which this court has held that counsel was constitutionally deficient during the penalty phase. In Smith v. Stewart, 140 F.3d 1263 (9th Cir.), cert. denied, --- U.S. ----, 119 S.Ct. 336, 142 L.Ed.2d 277 (1998), this court held that trial counsel provided ineffective assistance because counsel "provided no evidence at the penalty phase and virtually no argument," despite the fact that evidence of mitigating circumstances "was rather near the surface." Id. at 1269 (emphasis added). Counsel's only argument involved "a few asthenic comments to the effect that Smith still denied his guilt and that he was just 30 years of age. Nothing else!" Id. at 1268.
 
 
 92
 In Correll v. Stewart, 137 F.3d 1404 (9th Cir.), cert. denied, --- U.S. ----, 119 S.Ct. 450, --- L.Ed.2d ---- (1998), counsel failed to present any evidence of the petitioner's purported mental illness as a mitigating factor. Defense counsel's argument at the sentencing hearing took a total of eight transcript pages. We held that "[t]his almost complete absence of effort on the part of Correll's counsel to investigate, develop, and present mitigating evidence, including evidence of Correll's psychiatric history and his condition at the time of the murders, constitutes deficient performance 'outside the wide range of professionally competent assistance.' " Id. at 1412 (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052). In addition, defense counsel met with his client for just five minutes in the month between the jury verdict and the pre-sentencing hearing.
 
 
 93
 Other cases are to the same effect. In Hendricks v. Calderon, 70 F.3d 1032 (9th Cir.1995), counsel failed to conduct any investigation into mitigating evidence without a strategic rationale to justify the lack of preparation. See id. at 1043. In Clabourne, counsel "did not call any witnesses, introduce any evidence of Clabourne's history of mental illness, or argue any mitigating circumstances beside Clabourne's mental condition at the time of the offense." Clabourne, 64 F.3d at 1384. Clabourne's entire mitigation argument took up six pages of the sentencing hearing transcript. We held that "the total absence of advocacy [fell] outside Strickland 's 'wide range of professionally competent assistance,' " and that counsel's representation at the sentencing hearing "amount[ed] in every respect to no representation at all." Id. at 1387 (citations and internal quotation marks omitted).
 
 
 94
 These cases are instructive; Bean's counsel was not derelict in their duties compared to any of them. In these cases, counsel generally conducted no investigations, presented no mitigating evidence, made no arguments on behalf of their clients, and brought few (or no) witnesses to the stand. Of course, these cases do not stand for the proposition that only a complete failure to present mitigating evidence during the penalty phase will be sufficient to warrant a writ of habeas corpus for ineffective assistance of counsel, but they do serve as a valuable comparison. Bean's counsel did offer mitigating evidence to show Bean's background information and mental deficiencies and did make reasonable arguments on Bean's behalf. Although it would have been preferable for counsel to have asked different questions, presented more detailed mental health evidence, and investigated Bean's family background more carefully, the Constitution does not demand as much. Bean's counsel was not guilty of a "total absence of advocacy" amounting to no representation at all. Clabourne, 64 F.3d at 1387. In my opinion, therefore, Bean does not satisfy the first prong of the Strickland test.
 
 
 95
 Furthermore, under the second prong of the Strickland test, it is unlikely that, had the more detailed evidence now available regarding Bean's background and mental health been presented to the jury, the outcome of the trial would have changed. The jury was exposed to the majority of the evidence this court now points to as mitigating factors. Certainly, some of the more graphic details of Bean's childhood were not shared with the jury. The jury knew, however, that Bean spent time in juvenile detention, was whipped by his parents and left home at fifteen. Similarly, while the jury did not hear all the possible evidence of Bean's mental difficulties, the jury did hear two experts testify to Bean's brain damage. The added details discussed by the majority do not sufficiently change the overall picture of Bean's condition and history such that there is a reasonable probability that the outcome of the sentencing hearing would be different. In my opinion, therefore, Bean does not satisfy the second prong of the Strickland test.
 
 
 96
 I believe that the district court's decision to grant Bean a writ of habeas corpus for ineffective assistance of counsel during the penalty phase was error and should be reversed. I, therefore, respectfully dissent from Part III.
 
 II
 
 97
 Nor do I believe Bean has demonstrated that he suffered actual prejudice from the district court's discretionary refusal to sever Bean's two murder counts. We address this issue on collateral review after the California Supreme Court has thoroughly considered the facts and arguments. People v. Bean, 46 Cal.3d 919, 251 Cal.Rptr. 467, 760 P.2d 996 (1988). Out of respect for important notions of federalism, comity and finality, our review should be deferential to the state court findings.
 
 
 98
 As a general matter, "[t]he propriety of a consolidation rests within the sound discretion of the state trial judge." Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir.1989) (quoting Tribbitt v. Wainwright, 540 F.2d 840, 841 (5th Cir.1976)). In order for this court to issue a writ of habeas corpus, Bean must have shown that the trial court's failure to sever the counts against him "actually render[ed][his] state trial fundamentally unfair and hence, violative of due process." Id. at 1502 (emphasis added); see also Herring v. Meachum, 11 F.3d 374, 377 (2nd Cir.1993) ("In considering whether a violation of due process occurred, the emphasis must be on the word 'actually.' ") Neither the potential for prejudice nor even a high probability of prejudice will suffice; Bean must establish that prejudice actually resulted "from the events as they unfolded during the joint trial." Herring, 11 F.3d at 377-378. The Second Circuit has clearly articulated the procedural posture for this habeas corpus review:
 
 
 99
 [H]abeas petitioners challenging their state convictions under the general fairness mandate of the due process clause bear an onerous burden. Because of the significant procedural protection provided by direct review through the state system, we will not lightly conclude that state court proceedings were so arbitrary as to violate due process.
 
 
 100
 Herring, 11 F.3d at 378 (citing Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (presumption of fidelity and legality attaches to state criminal proceedings)).
 
 
 101
 Bean alleges, and the majority agrees, that Bean was prejudiced because joinder allowed evidence of the Schatz crime, evidence that otherwise would not have been admitted, to be used by the prosecution to bolster its weak Fox case. The California Supreme Court found that the evidence for the two murder counts was not cross-admissible. Certainly, this finding heightens the likelihood of prejudice because joinder risks tainting the jury's view of the accused with evidence that would not otherwise have been admissible. It does not lead, however, to an automatic finding of actual prejudice. Also, as Bean and the majority point out, joinder in these cases can be especially dangerous when strong evidence of one crime is used to bolster weak evidence of a second crime. The California Supreme Court considered all these arguments and still concluded, I think correctly, that Bean did not show that there was a substantial danger of prejudice from the joinder of the two offenses.
 
 
 102
 We have not directly addressed this issue in a habeas case. In United States v. Johnson, 820 F.2d 1065 (9th Cir.1987), a direct review case, however, we noted in dictum that:Even if the evidence would not have been admissible, the district court did not abuse its discretion because the jury was not likely in this case to confuse which count particular evidence was introduced to establish. When evidence concerning the other crime is limited or not admissible, our primary concern is whether the jury can reasonably be expected to "compartmentalize the evidence" so that evidence of one crime does not taint the jury's consideration of the other crime.
 
 
 103
 Johnson, 820 F.2d at 1071 (emphasis added). The court elaborated further, "[e]ven where evidence of one of the crimes is particularly weak, ... we consider[ ] principally whether the jury was likely to have been confused." Id. at 1071 n. 6 (citations omitted). The main issue we must decide is, therefore, whether the jury was reasonably able to distinguish evidence introduced in one case from evidence introduced in the other.
 
 
 104
 The California Supreme Court found that the evidence against Bean was sufficient on both counts and that "no spillover effect" of the evidence occurred. Bean, 46 Cal.3d at 940, 251 Cal.Rptr. 467, 760 P.2d 996. I agree. The evidence introduced for both the Fox offense and Schatz offense was simple and distinct, making it likely that the jury was able to keep the evidence separate when considering the various counts against Bean. See Herring, 11 F.3d at 378 ("Moreover, because the evidence with respect to each murder was distinct and easily compartmentalized, the risk of jury confusion at petitioner's trial was significantly limited."). The evidence of the Fox offenses consisted of Bean's fingerprint on a pair of sunglasses, witness testimony that Bean had been seen multiple times "casing" the Fox residence, and Bean's inconsistent testimony regarding ownership of the sunglasses. The evidence in the Schatz charge consisted of witnesses testifying to Bean's incriminating statements, a partial palm print, fingerprint, and footprints at the Schatz residence, and witness testimony. Neither the Fox nor the Schatz crimes involved complicated scenarios or crimes that involved confusing scientific evidence or complex transactions.
 
 
 105
 In addition, the two crimes were distinctly different. The Schatz crime involved two assailants breaking into a mobile home at night and attacking two victims with a hammer. The Fox crime involved a single assailant attacking a single woman with his fist or foot as she entered her house during the day. The evidence used to prove such distinctly distinguishable crimes is unlikely to have confused the jury. The majority, for example, is concerned that the jury would have been confused as to which crime the instructions regarding aiding and abetting, and conspiracy applied. This, I think, underestimates jury intelligence. Surely a jury would be able to realize that instructions regarding aiding and abetting, or conspiracy apply to the crime involving multiple assailants and not to the crime involving a single assailant. The majority also suggests that acquittal as to one of the counts would have established that the jury had compartmentalized the evidence. This is not an appropriate guide where, as here, there is sufficient evidence to convict the accused on both counts. In any event, the jury did bring in separate verdicts for the two murders and decided Bean should be sentenced to death for the Schatz murder and should get life imprisonment for the Fox murder.
 
 
 106
 The majority also worries that the trial court did not properly instruct the jury. It cites Johnson for the proposition that a jury can only compartmentalize the evidence if properly instructed to do so by the court. The jury instruction we found to be sufficient in Johnson was "[e]ach count charges a separate crime. You must decide separately what the evidence in the case shows about the crime." Id. at 1071. This instruction is not significantly more explicit than the instruction in Bean's trial. Although the trial court's instructions to the jury were certainly limited regarding the separateness of the crimes and their evidence, the jury was told it must "decide each count separately" and that "[e]ach count charges a distinct offense."
 
 
 107
 While I realize that the joinder of two counts always includes the risk that the jury will be prejudiced against a defendant charged with multiple crimes or that the jury will consider the evidence cumulatively, "joinder of offenses has long been recognized as a constitutionally acceptable accommodation of the defendant's right to a fair trial." Herring, 11 F.3d at 377. In this case, I am not convinced that Bean has presented evidence to show that he suffered actual prejudice as a result of the joinder of his two murder counts. I, therefore, must dissent from Part V. I would not second-guess the California Supreme Court's holding that joinder was not an abuse of discretion, and would affirm Bean's conviction for the Fox murder.
 
 
 
 [1]
 For instance, Machen elicited the following nebulous testimony from Bean's mother, Beatrice Bean, on direct examination:
 Q: And did [Bean] complete his education as far as getting a high school diploma?
 A: No.
 Q: Was he ever in any special education classes?
 A: Yes.
 Q: And why was this?
 A: Well, he didn't pass. I moved him--I moved him to another--I put him back because he didn't learn the first one.
 
 
 [2]
 As we have already affirmed the district court's grant of habeas relief as to Bean's death sentence, we need not reach his argument that the prejudicial misjoinder of the Schatz and Fox charges requires reversal of his sentence on the Schatz charges, as well as reversal of his conviction of the Fox offenses
 
 
 [3]
 Compare 28 U.S.C. § 2254(d)(8) (1996) (providing that state-court findings of fact are "presumed to be correct," unless federal court, after reviewing record, "concludes that such factual determination is not fairly supported by the record"; placing burden on petitioner to establish erroneousness of factual determination only if federal court does not itself find that record does not fairly support factual determination) with 28 U.S.C. § 2254(e)(1) (1998) (providing that state-court findings of fact are "presumed to be correct," and that petitioner has the "burden of rebutting the presumption of correctness by clear and convincing evidence")
 
 
 [1]
 When asked at the Sentencing Hearing what he would have done to Bean if he had not come home, Bean's father answered "I was going to whip him." In addition, when asked if he had anything to do with Bean leaving home, Bean's father answered "Well, I tell you, when you got kids you got to have a firm hand with them, you know, when you are raising them up. See, when the boys get a certain age they don't want to mind, see. But at my house, when they come up, I was the boss of the house. I don't let my kids rule my house. I'm the one that rules the house."